2014 UT App 112

STATE of Utah, Plaintiff and Appellee,

v.

Chad Matthew STEWART, Defendant and Appellant.

No. 20130258–CA.

Court of Appeals of Utah.

May 22, 2014.

Nathalie S. Skibine and Michael R. Sikora, for Appellant.

Sean D. Reyes and Deborah L. Bulkeley, for Appellee.

Senior Judge RUSSELL W. BENCH authored this Memorandum Decision, in which Judges J. FREDERIC VOROS JR. and STEPHEN L. ROTH concurred.[1]

Memorandum Decision

BENCH, Senior Judge:

¶ 1 Chad Matthew Stewart appeals his conviction of aggravated robbery, a first-degree felony, *see* Utah Code Ann. § 76–6–302 (LexisNexis 2012), and receiving stolen property, a second-degree felony, *see id.* §§ 76–6–408, –412(1) (Supp.2013). We affirm in part and reverse and remand in part.

¶ 2 In April 2011, Stewart drove a blue Mini Cooper to a Salt Lake City car dealership and test drove a BMW. The car salesman from the dealership (the Salesman) accompanied Stewart on the test drive. During the test drive, Stewart drove on Interstate 80 a short way into Parley's Canyon. The Salesman then requested that Stewart exit the interstate and turn around. Stewart pulled over, but instead of turning around, he stopped and told the Salesman that he needed to make a phone call. The Salesman testified at trial that after they had pulled over, Stewart "put a gun in [his] face and told [him] to ... put [his] stuff on the floor and get out of the car." The Salesman complied, and Stewart drove away in the BMW. The Salesman ran to a nearby building and called the police.

¶ 3 A police officer (the Officer) was assigned to investigate the incident and interviewed the Salesman that same day. The Salesman told the Officer that Stewart had pointed a gun at his head, "pulled the hammer back," and told him to get out of the car. The Officer also discovered that Stewart had left the blue Mini Cooper at the dealership. The Officer checked the National Crime Information Center (NCIC) database and learned that the Mini Cooper had been reported stolen from Zipcar, an hourly car rental company, in 2007. He then contacted the Zipcar manager listed in the NCIC database and verified the theft.

¶ 4 After stealing the BMW, Stewart drove to his family's home in Morgan, Utah. Stewart's stepbrother noticed a gun on the passenger seat of the car and observed that the dealer plates were still on the BMW. When Stewart's father came home, he became concerned about the dealer plates on the BMW and called the police. Stewart was arrested, and after waiving his *Miranda* rights, he admitted to the Officer that he had stolen the BMW. Stewart's father retrieved the gun and gave it to police. The gun turned out to be a "prop gun" loaded with blank ammunition. Stewart admitted to the Officer that he had the prop gun in his waistband when he

1. The Honorable Russell W. Bench, Senior Judge, sat by special assignment as authorized by law. *See generally* Utah Code Jud. Admin. R. 11–201(6).

test drove the BMW and that he believed the Salesman had seen it when he opened his jacket. Stewart denied that he ever pointed the gun at the Salesman but admitted that the Salesman "appeared to be in a state of shock" after seeing the gun and that he told the Salesman, "[I]t's time for you to go."

¶ 5 Stewart also admitted that he had "obtained" the Mini Cooper from Zipcar in 2007. He told the Officer that he had used the Mini Cooper as his personal car since then and had performed maintenance on it. Stewart also told the Officer that the Mini Cooper had only sixty miles on it when he obtained it from Zipcar and that he stole the BMW because the Mini Cooper now had 100,000 miles on it and "he just needed another car." Based on Stewart's explanation, the Officer believed "[t]here was no question" that Stewart stole the Mini Cooper.

¶ 6 Stewart was charged with aggravated robbery for stealing the BMW and theft by receiving stolen property in connection with the Mini Cooper. The jury convicted Stewart of both charges, and he now appeals.

■■■ ¶ 7 Stewart argues that we should reverse his aggravated robbery conviction because the Officer's testimony that the Salesman told him Stewart had pointed the gun at him and pulled back the hammer was inadmissible hearsay. He also argues that we should reverse his theft-by-receiving conviction because the Officer's testimony that he learned the car was stolen was inadmissible hearsay. "In reviewing the admissibility of hearsay, legal questions are reviewed for correctness while the ultimate ruling on admissibility is reviewed for an abuse of discretion." *State v. Gonzalez–Camargo*, 2012 UT App 366, ¶ 15, 293 P.3d 1121 (citation and internal quotation marks omitted). Nevertheless, even where we determine that a trial court's admissibility ruling is erroneous, "we will not overturn a conviction unless we conclude that there is a reasonable likelihood that the error affected the outcome of the proceedings." *State v. Workman*, 2005 UT 66, ¶ 23, 122 P.3d 639 (citation and internal quotation marks omitted); *see also* Utah R.Crim. P. 30(a).

■■■ ¶ 8 Stewart first argues that the trial court should not have permitted the Officer to testify that the Salesman told him that Stewart had pointed the gun at the Salesman's head and pulled back the hammer. However, we agree with the State that there was no reasonable likelihood that this testimony impacted the outcome of the trial. Accordingly, any error in admitting the testimony was harmless.

■■■ ¶ 9 "A person commits aggravated robbery if in the course of committing robbery, he ... uses or threatens to use a dangerous weapon...." Utah Code Ann. § 76–6–302(1)(a) (LexisNexis 2012). "[I]t is not necessary that the State prove that the robber actually pointed a gun at the victim" in order to establish use or threatened use of a dangerous weapon. *In re R.G.B.*, 597 P.2d 1333, 1335 (Utah 1979). "If merely exhibiting the gun creates fear in the victim, it constitutes use of a [dangerous weapon] for that purpose." *State v. Graham*, 2011 UT App 332, ¶¶ 29–31, 263 P.3d 569 (alteration in original) (citation and internal quotation marks omitted).

¶ 10 Here, Stewart's admission that he had the gun in his waistband and that he exposed the gun to the Salesman's view when he threatened him was sufficient for the jury to convict him of aggravated robbery, and it is likely that the jury would have convicted Stewart on that evidence alone. *See In re R.G.B.*, 597 P.2d at 1334–35 (holding that a robber could be deemed to have used a firearm in the commission of a robbery, despite never removing the gun from the waistband of his jeans, where he revealed the gun to the victim for the purpose of invoking fear); *State v. Weisberg*, 2002 UT App 434, ¶¶ 2–3, 10, 16–17, 62 P.3d 457 (holding that the defendant's action of taking a shotgun from the passenger compartment of his car and moving it to the trunk, while in the parking lot of his alleged stalking victim's workplace, constituted use of a dangerous weapon because the jury could reasonably find that his action was intended to create fear in the victim). In any event, the Salesman's testimony that Stewart pointed the gun at him was strong evidence that Stewart used a dangerous weapon. This evidence was only marginally

undercut by defense counsel's emphasis of the Salesman's uncertainty regarding whether the gun was pointed at his head or his face, and it was only marginally bolstered by the Officer's testimony, which was largely cumulative of what the Salesman himself testified. Given the Salesman's testimony that Stewart pointed the gun at him, coupled with Stewart's own admission that he revealed the gun to the Salesman, we are simply not convinced that there was a reasonable likelihood of a different outcome in the absence of the Officer's testimony.[2]

¶ 11 Stewart next argues that his conviction for theft by receiving stolen property should be reversed because the Officer's testimony that he confirmed the car was stolen was based on inadmissible hearsay. Although the trial court prevented the Officer from testifying about what the Zipcar manager told him about the Mini Cooper, it permitted the Officer to testify that as a result of calling the manager, he "verified that the vehicle had been reported stolen back in 2007." It further permitted him to testify that he discovered, "[a]s a result of [his] investigation," "[t]hat the Mini was listed as a stolen vehicle." This discovery was apparently the result of the Officer's search of the NCIC database. Stewart asserts that both the contents of the NCIC database[3] and the information obtained from the Zipcar manager were hearsay. See Utah R. Evid. 801(c)(1)-(2) (defining hearsay as a statement "the declarant does not make while testifying at the current trial" but which is offered "to prove the truth of the matter asserted in the statement"); State v. Sibert, 6 Utah 2d 198, 310 P.2d 388, 390 (1957) ("The term hearsay is applied to testimony offered to prove facts of which the witness has no personal knowl-

edge, but which have been told to him by others."). The State does not contest Stewart's assertion but maintains that any error in admitting the hearsay was harmless in light of Stewart's own admissions. We disagree.

¶ 12 Stewart admitted to the Officer that he "obtained" the Mini Cooper from Zipcar when it had only sixty miles on it, and the Officer testified that there was "no question in [his] mind" that what Stewart meant by this admission was that he had stolen the car from Zipcar. However, Stewart did not explicitly admit to stealing the Mini Cooper. As Stewart points out, the Officer's statement that Stewart told him he "obtained" the Mini Cooper from Zipcar leaves open alternative possibilities, such as that "Stewart was paying to rent the car for an extended period of time or that he had purchased it used from the rental company." Though the jury may still ultimately have convicted Stewart of theft by receiving on the evidence presented, the Officer's testimony that he had confirmed the car to be stolen was strong evidence in support of conviction. Under the circumstances, we are convinced "that there is a reasonable likelihood that the error affected the outcome of the proceedings." State v. Workman, 2005 UT 66, ¶ 23, 122 P.3d 639 (citation and internal quotation marks omitted). In light of our conclusion, we need not address Stewart's confrontation clause argument.

¶ 13 In summary, we conclude that any error committed by the trial court in permitting the Officer to testify to what the Salesman told him was harmless. However, the trial court's error in permitting the Officer to

---

2. The State asserts that Stewart failed to preserve his objection to the Officer's testimony that the Salesman told him Stewart pulled back the hammer on the gun. However, even assuming that this objection was preserved, we do not agree that the testimony had any likelihood of impacting the result of the trial.

3. A number of other jurisdictions have concluded that NCIC information is hearsay, see, e.g., Vlietstra v. State, 800 N.E.2d 972, 975 n. 5 (Ind.Ct. App.2003) (collecting cases), though under appropriate circumstances, it may be admissible

under the business records exception to the hearsay rule, see, e.g., Frye v. Commonwealth, 231 Va. 370, 345 S.E.2d 267, 279–80 (1986); see also Utah R. Evid. 803(6) (outlining the business records exception). In this case, the State made no attempt to lay a proper foundation for the admission of the NCIC information under the business records exception. See State v. Bertul, 664 P.2d 1181, 1184 (Utah 1983) (outlining the foundational requirements for admitting hearsay under the business records exception).

testify regarding information he obtained from the Zipcar manager and to testify, without proper foundation, regarding the contents of the NCIC database was harmful. We therefore affirm Stewart's conviction for aggravated robbery but reverse his conviction for theft by receiving and remand for a new trial on that charge.